FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2016 MAY 24   AM 11: 31

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

UNITED STATES OF AMERICA,

Plaintiff,

v.

CASE NO. 3:16-cv-633-J-39 JRK

$817,426.12 SEIZED FROM BANCORP
BANK ACCOUNT XXXXXX0651, HELD IN
THE NAME OF NATHAN GIBSON;

$872,570.79 SEIZED FROM BANCORP
BANK ACCOUNT XXXXXX6758, HELD IN
THE NAME OF SEAN MACKERT;

$224,705.03 SEIZED FROM COINBASE
ACCOUNT XXXXXXXXXXXXXXXXXXXX000ad,
HELD IN THE NAME OF NATHAN GIBSON;

$354,314.58 SEIZED FROM COINBASE
ACCOUNT XXXXXXXXXXXXXXXXXXXX0061,
HELD IN THE NAME OF SEAN MACKERT;

$49,840.66 SEIZED FROM BANK OF
AMERICA ACCOUNT XXXXXXXX0836, HELD
IN THE NAME OF NATHAN GIBSON;

$891,400.00 IN U.S. CURRENCY VOLUNTARILY SURRENDERED
BY SEAN MACKERT AT THE RESIDENCE
LOCATED AT 13448 SELLERS LANE, JACKSONVILLE, FLORIDA:

$5,420.00 IN U.S. CURRENCY VOLUNTARILY SURRENDERED
BY SEAN MACKERT AT HIS
RESIDENCE LOCATED AT 1274 BELMONTE
TERRACE, JACKSONVILLE, FLORIDA;

$78,480.00 IN U.S. CURRENCY VOLUNTARILY
SURRENDERED BY NATHAN GIBSON AT HIS
RESIDENCE LOCATED AT 1316 TIMBER
LANE, JACKSONVILLE, FLORIDA;

$380,043.13 VOLUNTARILY SURRENDERED
FROM A DIGITAL WALLET LIQUIDATED
THROUGH COINBASE, HELD IN THE NAME
OF SEAN MACKERT, AND CONVERTED TO
UNITED STATES DOLLARS BY BANK OF
AMERICA, CASHIER'S CHECK NO.
1566901452;

$814,267.12 VOLUNTARILY SURRENDERED
FROM A DIGITAL WALLET LIQUIDATED
THROUGH COINBASE, HELD IN THE NAME
OF NATHAN GIBSON; AND CONVERTED TO
UNITED STATES DOLLARS BY BANK OF
AMERICA, CASHIER'S CHECK NO.
1566901532;

$25,759.82 VOLUNTARILY SURRENDERED BY
SEAN MACKERT FROM VYSTAR CREDIT UNION
ACCOUNT XXXXXXXX6010, HELD IN THE NAME
OF SEAN MACKERT;

A 2012 TOYOTA CAMRY, VIN
4T1BF1FK6CU028092, VOLUNTARILY SURRENDERED BY
NATHAN GIBSON;

and

A 2008 HONDA MOTORCYCLE, VIN
JH2PC40418M101169, VOLUNTARILY SURRENDERED BY
SEAN MACKERT,

                    Defendants.


## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or

Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of America

brings this complaint and alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit to the United States of America,

the following:

     a.    $817,426.12 seized from Bancorp Bank Account XXXXXX0651, held in the name of Nathan Gibson;

     b.    $872,570.79 seized from Bancorp Bank Account XXXXXX6758, held in the name of Sean Mackert;

     c.    $224,705.03 seized from Coinbase Account XXXXXXXXXXXXXXXXXXXX000ad, held in the name of Nathan Gibson;

     d.    $354,314.58 seized from Coinbase Account XXXXXXXXXXXXXXXXXXXX0061, held in the name of Sean Mackert;

     e.    $49,840.66 seized from Bank of America Account XXXXXXXX0836, held in the name of Nathan Gibson;

     f.    $891,400.00 In U.S. Currency voluntarily surrendered by Sean Mackert at the residence at 13448 Sellers Lane, Jacksonville, Florida;

     g.    $5,420.00 in U.S. Currency voluntarily surrendered by Sean Mackert at his residence located at 1274 Belmonte Terrace, Jacksonville, Florida;

     h.    $78,480.00 In U.S. Currency voluntarily surrendered by Nathan Gibson at his residence located at 1316 Timber Lane, Jacksonville, Florida;

     i.    $380,043.13 voluntarily surrendered from a Digital Wallet liquidated through Coinbase, held in the name of Sean Mackert, and

converted to United States dollars by Bank
of America, Cashier's Check No. 1566901452;

j.   $814,267.12 voluntarily surrendered from a
Digital Wallet liquidated through Coinbase,
held in the name of Nathan Gibson and
converted to United States dollars by Bank
of America, Cashier's Check No. 1566901532;

k.   $25,759.82 voluntarily surrendered by Sean
Mackert from Vystar Credit Union Account
XXXXXXXX6010, held in the name of Sean
Mackert;

l.   a 2012 Toyota Camry, Vin 4T1BF1FK6CU028092,
voluntarily surrendered by Nathan Gibson; and

m.   A 2008 Honda Motorcycle, Vin JH2PC40418M101169,
voluntarily surrendered by Sean Mackert,

(defendant assets), pursuant to 18 U.S.C. § 981(a)(1)(C), because the defendant

assets consist of  the proceeds of wire fraud and/or the transportation of stolen

goods, securities, moneys,... or articles used in counterfeiting, committed in

violation of 18 U.S.C. §§ 1343 and 2314, and pursuant to 18 U.S.C.

§ 981(a)(1)(A), which provides for the civil forfeiture of any property, real or

personal, involved in a transaction or attempted transaction in violation of

sections 1956 and/or 1957 (money laundering).  18 U.S.C. § 1956(c)(7)(A),

through section 1961(1), classifies any violations of 18 U.S.C. §§ 1343 and

2314 as specified unlawful activity.

## JURISDICTION AND VENUE

2.   This Court has subject matter jurisdiction over this action pursuant

to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil

4

actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

3.     This Court has *in rem* jurisdiction over the defendant assets because pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida.  28 U.S.C. § 1355(b)(1)(A).

4.     Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395(a) because the defendant assets were seized within the Middle District of Florida, Jacksonville Division.

## THE DEFENDANTS *IN REM*

5.     The following defendant assets were seized in the Middle District of Florida pursuant to federal seizure warrants issued by United States Magistrate Judge Monte C. Richardson.  The defendant funds were deposited into the Customs Suspense Account:

| | | |
|---|---|---|
| $817,426.12 | seized: 03/26/14 | Case No. 3:14-mj-1042-MCR |
| $872,570.79 | seized: 03/26/14 | Case No. 3:14-mj-1043-MCR |
| $224,705.03 | seized: 03/24/14 | Case No. 3:14-mj-1044-MCR |
| $354,314.58 | seized: 03/24/14 | Case No. 3:14-mj-1045-MCR |
| $ 49,840.66 | seized: 04/03/14 | Case No. 3:14-mj-1046-MCR |

6.     The following defendant assets were voluntarily surrendered by Sean Mackert and Nathan Gibson to Homeland Security Investigations agents in

the Middle District of Florida and were deposited into the Customs Suspense

Account:

| | |
|---|---|
| $891,400.00 | seized: 03/12/14 |
| $ 5,420.00 | seized: 03/20/14 |
| $ 78,480.00 | seized: 03/21/14 |
| $380,043.13 | seized: 03/26/14 |
| $814,267.12 | seized: 04/08/14 |
| $ 25,759.82 | seized: 05/13/14 |

7.     On March 25, 2014, the defendant 2012 Toyota Camry was

voluntarily surrendered by Nathan Gibson to Homeland Security Investigations

agents in the Middle District of Florida where it currently is stored.

8.     On March 28, 2014, the defendant 2008 Honda Motorcycle was

voluntarily surrendered by Sean Mackert to Homeland Security Investigations

agents in the Middle District of Florida where it currently is stored.

9.     Because the defendant assets are in the government's possession,

custody, and control, the United States requests that the Clerk of Court issue

warrants of arrest *in rem*, upon the filing of the complaint, pursuant to

Supplemental Rule G(3)(b)(1). The United States will then execute the warrants

on the assets pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c)

### .FORFEITURE AUTHORITY

10.     Because the defendant assets constitute, or were derived from,

proceeds of wire fraud and the transportation of stolen goods, securities, or

moneys, they are subject to forfeiture to the United States pursuant to 18 U.S.C.

§ 981(a)(1)(C), which states the United States may civilly forfeit proceeds or

6

property derived from the proceeds of "specified unlawful activity, " as defined in

18 U.S.C. § 1956(c)(7).  Section 1956(c)(7) defines "specified unlawful activity" to

include activities described in section 1961(1), such as violations of 18 U.S.C. §

1343 (wire fraud) and § 2314.(transportation of stolen good, securities, money).

11.    Because monetary transactions were conducted with funds derived

from specified unlawful activity (specifically wire fraud and transportation of

stolen property), the defendant assets are also subject to forfeiture pursuant to

18 U.S.C. § 981(a)(1)(A)  which states that the government may forfeiture any

property, real or personal, involved in a transaction or attempted transaction in

violation of sections 1956 and 1957.

12.    Specific details of the facts supporting the forfeiture of the

defendant assets have been provided by United States Department of Homeland

Security, United States Immigration and Customs Enforcement (ICE), Homeland

Security Investigations (HSI), Special Agent Robert R. Johnston (SA Johnston),

who obtained the information through investigation, reviewing documents, and

communicating with witnesses and other law enforcement officers.

13.    The facts set forth below are not all the facts gathered by law

enforcement during the investigation.  Rather, as required by Rule G(2)(f), the

facts set forth herein support a reasonable belief that the government will be able

to meet its burden of proof at trial.  Specifically, that the government will be able

to show by a preponderance of the evidence that the defendant assets are

proceeds subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A).

## FACTS

14.    SA Johnston has been a Special Agent for the United States Department of Homeland Security, HSI, since March 2003.  Prior to his employment with HSI, he worked as a Deputy for the Aiken County Sheriff's Office in Aiken, South Carolina, for five years, three of which were as a Criminal Investigator.  He was previously assigned to the HSI Buffalo, New York office from July 2003 to April 2007.  He has participated in numerous types of investigations, during the course of which he conducted or participated in physical surveillance, undercover transactions, executions of search warrants, controlled delivery transactions of narcotics domestically and internationally, reverse undercover operations, historical investigations, extradition cases and other complex investigations.

## DEFINITIONS

15.    **Bitcoin network** is a peer-to-peer payment network that operates on a cryptographic protocol.  Users send bitcoins[1], the unit of currency, by broadcasting digitally signed messages to the network using Bitcoin wallet software.  Transactions are recorded into a distributed public database known as the block chain, with consensus achieved by a proof-of-work system called

---

[1] Conventionally, the capitalized word "Bitcoin" refers to the technology and network, whereas lowercase "bitcoin" (BTC) refers to the currency itself.

8

"mining". The block chain is distributed internationally using peer-to-peer file sharing technology. The network timestamps transactions by including them in blocks that form an ongoing chain called the block chain. Such blocks cannot be changed without redoing the work that was required to create each block since the modified block. The longest chain serves not only as proof of the sequence of events but also records that this sequence of events was verified by a majority of the Bitcoin network's computing power. Upon reconnection, a node will download and verify new blocks from other nodes to complete its local copy of the block chain.

16.    **Blockchain** - Integral to the Bitcoin network is a public ledger, which is a database with a sequential record of all transactions, known as the blockchain, that records bitcoin ownership at present and at all points in the past. Users send payments by broadcasting digitally signed messages to the network requesting an update to the public transaction database, i.e. blockchain. A transaction transfers ownership from one Bitcoin address (also known as a "wallet") to another Bitcoin address and must be recorded in the blockchain to take effect. Approximately every ten minutes a bundle of transactions, called a "block," is added to a public ledger or transaction record, which is why it is called a blockchain. By keeping a record of all transactions, the blockchain prevents double-spending, a problem particular to digital money. The blockchain provides only a certain level of anonymity; it identifies receivers by Bitcoin addresses, not individuals' names. Tracking the flow of bitcoins, which is accomplished using

9

sites such as blockchain.info, can give clues as to who owns them since bitcoin intermediaries, such as Coinbase (described below), are required by law in many jurisdictions to collect personal customer data.

17.    **Coinbase, Inc.** – Coinbase is a U.S. company based in San Francisco, California.  Coinbase is a Money Service Business that operates as a bitcoin exchange.  Coinbase collects personal customer data of its clients.

18.    **Sheep Marketplace (SMP)**-The Sheep Marketplace was an anonymous[2] marketplace that operated on the TOR network in the "Deep Web." The site predominately was used for the illicit sale of narcotics after the Silk Road site was shut down by the FBI in October 2013.  It was founded in March 2013 and closed at the beginning of December 2013.  SMP's web address on the TOR network was sheep5u64fi457aw.onion.

### CRIMINAL VIOLATIONS

19.    On November 21, 2013, a theft of approximately 5400 bitcoins (whose value if they were instantly sold at the time of the theft would have been $6.6 million) occurred when a vendor on the illicit site Sheep Marketplace caused the site to send the cryptocurrency bitcoins that it held in escrow to several bitcoin "wallets," (addresses that were not in control of the site's administrator). The victims of the theft were those who sold and purchased illicit narcotics and

---

[2] Given the illicit nature of the SMP, there is no identifiable person to attribute ownership of the marketplace site.

conducted other criminal activity. The site was fashioned to hide its participants

identities, which also helped mask the individuals carrying out the theft.

20.    After the November 21, 2013, theft, the following message was

posted on Sheep Marketplace's homepage.

> **Sheep is down**
>
> We are sorry to say, but we were robbed on Saturday
> 11/21/2013 by vendor EBOOK101. This vendor found
> bug in system and stole 5400 BTC - your money, our
> provisions, all was stolen. We were trying to resolve this
> problem, but we were not successful. We are sorry for your
> problems and inconvenience, all of current BTC will be
> distributed to users, who have filled correct BTC emergency
> address.
>
> I would like to thank to all Sheep Market place moderators
> by this, who were helping with this problem. I am very sorry
> for this situation. Thank you all.
>
> New alternative Marketplace: http://tormarkozaegyvco.onion/ "

21.    SA Gino, an HSI Special Agent, who assisted SA Johnston with this

case, located information on both the surface web and Deep Web regarding the

alleged theft on November 21, 2013.  The information purported to show the

transactions streams from the Sheep Marketplace's bitcoin wallets at the time.

SA Gino and SA Johnston believed this information was provided to the Sheep

Marketplace moderators by the SMP administration.

22.    Since all bitcoin exchanges are transparent, every transaction can

be traced by using the internet.  SA Gino utilized the Blockchain.info website to

observe the public ledger for the purported theft.  SA Gino was able to confirm

that on November 21, 2013, 5358.69878 bitcoins were transferred into 14 bitcoin addresses over the course of less than 3 hours. The information SA Gino observed from the public ledger was consistent with transactions which were believed to be posted by the Sheep Marketplace's moderator, as discussed in paragraph 21. above.

23.     SA Gino utilized the public ledger to perform an accounting of each transaction from each address. In doing this, he was able to observe a sequential record of all transactions, as well as identify the transfer of bitcoins from one address to another.

24.     For instance, as a result of the theft, 1200.09166 bitcoins were transferred to Bitcoin Address 2, where they were almost immediately transferred to multiple other addresses.  SA Gino followed each transaction and noted the different paths the bitcoins would take after each transaction.  SA Gino observed that although the bitcoins were being split and the transactions were creating multiple paths, they could be tracked.  SA Gino also noticed that some paths ultimately joined with each other combining those bitcoins back together.

25.     SA Gino followed one path that consisted of 16 sequential transactions. The path originated at Bitcoin Address 2, and ended at Bitcoin Address XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXAzxE  SA Gino noted that this Bitcoin Address had a total of ten transactions, eight in and two out. These transactions all took place on December 31, 2013, during a 35- minute period.  The Bitcoin Address received over 218 bitcoins during this period, which at the time of transaction was

12

valued at over $150,000.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXAzxE sent

out two transactions, one consisting of over 178 bitcoins and the other one 39

bitcoins.  Based on these patterns, SA Gino believed the two transactions being sent

out represented the bitcoins being sold at an exchange.

     26.    On January 23, 2014, Coinbase provided information in response

to a subpoena submitted by SA Gino.  Coinbase informed SA Gino that

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXAzxE was an address assigned by

Coinbase to Gibson.  Coinbase also provided information showing Gibson's

Coinbase account to was linked Bancorp Bank account ******0651.

     27.    Coinbase informed SA Gino that between December 26, 2013 and

January 20, 2014, Gibson had deposited over 842 bitcoins valued at over

$646,000.

     28.    Coinbase also advised that Gibson was sharing a device as well as

logging into the Coinbase site from the same Internet Protocol (IP) location as

Mackert, who was another Coinbase customer.  Mackert had linked his Coinbase

account to Bancorp bank account ******6758.

     29.    Coinbase records show that both Gibson and Mackert reside in

Jacksonville, Florida.  Coinbase informed SA Gino that Mackert had opened his

Coinbase account on December 30, 2013.  Coinbase documents also detail that

between December 31, 2013 and January 20, 2014, Mackert deposited over

1016 bitcoins valued at over $670,000.

30.    In reviewing the Coinbase transactional history of Mackert, SA Gino

identified that on December 31, 2013, Mackert's Coinbase account received its first

bitcoin deposit into Bitcoin address XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXGvob

from Bitcoin address XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXAouX.  The deposit

was for 7.72081602 bitcoins.   SA Gino studied the previous 24 sequential transactions

of those 7.72081602 bitcoins in the public ledger to discover that the 7.72081602

originated from Bitcoin Address 6 twenty-five hours earlier.  SA Gino recognized Bitcoin

Address 6 as one of the original 14 wallets suspected in the Sheep Marketplace thefts

on November 21, 2013. Bitcoin Address 6 received 200.00152 bitcoins during the

alleged heist.

31.    SA Gino's analysis of transactional paths revealed bitcoin addresses

utilized in transactions that had derived from the 14 recipient bitcoin addresses of

the November 21, 2013 theft.  These addresses were utilized in transactions of

bitcoins that were ultimately deposited into both Gibson's and Mackert's Coinbase

accounts. This is documented on numerous occasions.

32.    SA Johnston subsequently learned that on December 10, 2013,

Nathan Gibson deposited $149,620.00 in U.S. currency at the Jax Federal Credit

Union (JFCU) located at 562 Park Street, Jacksonville FL 32204.  On the same

date, Mackert accompanied Gibson into the JFCU with $150,010.00, in U.S.

currency, and advised that he wished to open an account as well.  Gibson

advised that he would be bringing in more cash, up to a million dollars.

33.    Nassau County Detective Keith Crean, who is assigned to work financial crimes for Northeast Florida High Intensity Drug Trafficking Area (HIDTA), spoke to Nikki Harrell, JFCU.  Harrell confirmed that after meeting with management personnel on December 11, 2013, about the deposits both accounts (Mackert's and Gibson's) were closed and the currency returned to Mackert and Gibson.

34.    SA Gino was advised by Coinbase that between March 6, 2014 and March 11, 2014, Gibson's Coinbase account was credited $242,670.74 which resulted in the deposit of 583 bitcoins.  This credit was the result of U.S. currency that had already been converted from bitcoin, being sent back to Coinbase by Bancorp. Upon receipt, Coinbase converted the U.S. currency back to bitcoin. Per SA Johnston's conversation with Bancorp, this action was prompted by suspicious activity in the account and Bancorp refusing to accept any additional ACH transfers to Gibson's account.

35.    SA Gino was further advised by Coinbase that between March 6, 2014 and March 11, 2014, Mackert's Coinbase account was credited $250,848.92, which resulted in the deposit of 424.98 bitcoins.  This credit was the result of U.S. currency that had already been converted from bitcoin, being sent back to Coinbase by Bancorp. Upon receipt, Coinbase converted the US currency back to bitcoin.  Per my conversation with Bancorp, this action was prompted by suspicious activity in the account and Bancorp refusing to accept any additional ACH transfers to Mackert's account.

36.     SA Johnston received further information from Coinbase indicating that on March 7, 2014, Gibson added two new banks to his Coinbase account. He provided routing number 031100157 and listed account "*******9275. Gibson also provided routing number 063100277 and listed Bank of America account ********0836.  Based on information SA Johnston received from Coinbase and SIMPLE[3], SA Johnston was able to determine that currency derived from the sale of the stolen bitcoins was wired into this Bank of America account ********0836.

37.     On March 11, 2014, SA Johnston received information from Coinbase indicating that Mackert added a new bank to his Coinbase account bearing Routing number 031100157 and listed as "*******9623.  SA Johnston queried this routing number and determined that it belongs to PNC Bank.

38.     Based on information SA Johnston received from SIMPLE, he knew that Gibson and Mackert had accounts with SIMPLE. All funds in Gibson and Mackert's SIMPLE accounts were held by Bancorp Bank.

39.     On March 13, 2014, SA Johnston spoke with Myfanwy Bonilla, who works for Bancorp, Bank. Bonilla advised that Bancorp had closed the accounts of Gibson and Mackert due to suspicious activity.  Bonilla also stated that Mackert and Gibson claimed to be bitcoin miners and that the amount of currency being converted was unrealistic based on her training and experience. Bonilla advised that Bancorp had closed the accounts based on an internal

---

[3] SIMPLE (Simple Finance Technology) is an internet banking service, in partnership with Bancorp Bank.

investigation to validate the legitimacy of the funds.  Bonilla told SA Johnston

that a portion of the account balances were ACH transferred back to Coinbase.

Bonilla also advised that Mackert and Gibson had received the following:

- GIBSON received, between 12-31-2013 and 03-05-2013, $1,0059,283.53 in ACH transfers from Coinbase.

- MACKERT received, between 1-03-2014 and 03-07-2014, $1,150,200.12 in ACH transfers from Coinbase.

40.    SA Johnston was also advised that the following balances were

remaining in the accounts at Bancorp:

- GIBSON- Account # XXXXXX0651, $817,423.66

- MACKERT- Account# XXXXXX6758, $872,568.16

41.    SA Johnston subsequently reviewed documents from SIMPLE,

which showed that on December 26, 2013, GIBSON had a balance of $6.33.

However, on March 7, 2014, Gibson had a balance of $617,422.13.  On June 1,

2013, Mackert had a balance of $0.00, and on January 3, 2014, there was a

balance of $7,941.99.  However, on March 8, 2014, Mackert had a balance of

$930,875.86.  It is the belief of SA Johnston that this exponential growth of

wealth to both Gibson and Mackert's accounts are consistent with the dates of

the bitcoin theft and the large amount of currency expected.

42.    SA Johnston also received information from the Florida State

Department of Revenue which showed that Gibson's reported earnings in 2013

were for $45,464.20 and that Gibson was employed by Information and Computing

Services.  Mackert's reported earnings for 2013 were $11,079.68 and he showed

employment at Kelly Services, Inc. (which SA Johnston knows to be a temp

agency).

## CONCLUSION

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff, United States

of America, requests that this Court initiate a process of a forfeiture against the

defendant funds, vehicle and motorcycle, and duly notice all interested parties to

appear and show cause why the forfeiture should not be decreed.

The United States further requests that the Court order the defendant

funds, vehicle and motorcycle forfeited to the United States for disposition

according to law and grant the United States such other and further relief as this

case may require.

Dated:  May 20, 2016                       Respectfully submitted,

                                           A. LEE BENTLEY, III
                                           United States Attorney


                                   By:     BONNIE A. GLOBER
                                           Assistant United States Attorney
                                           Florida Bar No. 0748307
                                           300 North Hogan Street, Suite 700
                                           Jacksonville, Florida 32202-4270
                                           Telephone:   (904) 301-6300
                                           Facsimile:   (904) 301-6310
                                           E-mail:      bonnie.glober@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Robert R. Johnston, declare under the penalty of perjury, that

I am a Special Agent with United States Department of Homeland Security, United States Immigration and Customs Enforcement - Homeland Security Investigations.  I have read the foregoing Verified Complaint for Forfeiture in Rem and know the contents thereof, and that the matters contained in the Verified Complaint are true to my knowledge and belief.

I have acquired my knowledge in this matter through my personal experience, observation, and investigation, and through information conveyed to me by other law enforcement officers, as well as information contained in the official files and records of the United States.

Executed this __24__ day of __MAY_____, 2016.

ROBERT R. JOHNSTON
Special Agent
Homeland Security Investigations